IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CALVIN LETROY HUNTER | § | |
| v. | § | Cause # 4:10-cv-00778 |
| RICK THALER | § | |

### **PETITIONER'S TRAVERSE AND RESPONSE**

TO THE HONORABLE JUDGE IN SAID CASE:

COMES NOW, the accused, Calvin Letroy Hunter, by and through his attorney of record, Patrick F. McCann and files this, his Response. The opposing counsel in this matter has been contacted and is unopposed to the motion.

      I.  Initial Remarks
      II.

The state, on behalf of Director Thaler, has essentially ignored that the critical keystone of Dr. Denkowski's testimony, which was the basis of both the trial court's findings and the state's case in attempting to counter the large amount of evidence that Mr. Hunter was retarded, was a stone that has now crumbled into dust.

Dr. Denkowski has been called before a medical review board to answer complaints about his methodology in determing retardation.  (See original petition and filings by Mr. Hunter)  That board has continually failed to make a final resolution of Dr. Denkowski's flawed methods and questionable practices; those practices were clearly pointed out in two separate affidavits by both Patricia Averill and Dr. J. Hayes in the original petition.  The state is hoping to ignore the simple fact that their expert, upon whom the both the jury verdict and the findings depend, was found **by the Court of Criminal Appeals** to be an untrustworthy source upon which to base a determination regarding mental retardation.  See *Ex Parte Plata* as cited in original petition.

1

Thus the state has failed to explain *why* the findings are entitled to deference when the Court of Criminal Appeals in an identical case determined the exact opposite result it did here, or why such deference is not an unreasonable determination of fact or a clear violation of clear existing federal laws under 2254 (d)(1).   Since the foundation of the state's case is essentially based on the quicksand of Dr. Denkowski's questionable qualifications, and since the state's high court appears to have a split opinion in regards to Dr. Denkowski, it is the Petitioner's view that this Honorable Court should hold a hearing on the issue of whether or not Mr. Hunter is retarded and thus ineligible for execution under *Atkins v. Virginia* since the CCA clearly either has misapplied the law under Atkins, misread the facts or made an unreasonable determination on them in view of the challenges and questions regarding Dr. Denkowski.

The Petitioner will answer the State's arguments separately in regards to the other claims, but believed that a specific response was due on the State's failure to answer on behalf of the Respondent as to the underlying fundamental issue – the sponsoring by the State of false or materially misleading expert testimony by Dr. Denkowski, and the irreparable damage that did to Mr. Hunter's right to a fair determination of his death sentence.

III. Traverse to the State's arguments

*In re any claim of procedural bar*

The State correctly states that there is now a dispute within the Fifth Circuit as to whether the Court of Criminal appeals should continue to enjoy immunity from scrutiny whenever it invokes the doctrine of "abuse of the writ".  Since *Balentine v. Thaler*, 609 F.3d 729 (5th Cir. 2010) the Fifth Circuit has concluded that "abuse of the writ doctrine cannot be invoked when the CCA actually does not expressly state an independent and adequate state ground for

2

dismissal.  Petitioner Hunter acknowledges on his part that the Director has petitioned for en banc review but the fact remains that the long-maintained cloak that Texas used to shield it from federal review is beginning to tatter.

As to the Respondent's claim that this somehow falls under *Hughes v. Thaler* because the order magically recites the words "abuse of the writ" that also fails.  First, the words do not change the analysis under *Balentine* – the CCA still failed to announce or explain an adequate and independent state ground that would shield this from review.  Since the terms of Article 11.071, Sec 5 specifically mention either <u>new facts</u> or a new decision by CCA or the United States Supreme Court as a grounds for consideration, the CCA has specifically opened itself up to review as either an unreasonable determination of the facts or an incorrect application of the clearly established federal law since it does not exclude the Supreme Court as a source or consideration in its decision.  Likewise the simple fact that the new complaints against Dr. Denkowski <u>are</u> newly discovered facts that would not have been available at the time of the first application seems to be obvious.  Last, the CCA determined a completely different result and granted relief and remand on the *Plata* case based upon Dr. Denkowski's likely faulty determinations; the Respondent cannot logically invoke the doctrine of abuse of the writ when the CCA's own determinations are at opposite ends of the legal spectrum on the same issue.

As a final note, it is interesting that the respondent cites *Ex Parte Barber* 879, SW 2d 889, 892 note 1 (Tex. Crim. App. 1994) because in that note the Court of Criminal Appeals makes it quite clear that it is actually adopting the <u>federal</u> doctrine of abuse of the writ, and that it has within its own powers the ability to set aside its findings or decisions since it is the final arbiter in death cases. See note 1, id.  Thus the entire Texas "abuse of the writ doctrine" is

actually predicated on the federal doctrine, and thus should not be raised as a bar to federal review of constitutional claims.

***Responding claim by claim.***

CLAIM ONE

The state in its response makes it clear that the retardation issue in *Ex Parte Plata*, 75, 820-02 (Order on Motion for reconsideration) was essentially the same as is raised in this issue since the complaint against Denkowski and his testing (the same methodologies which were suspect in Mr. Hunters case) resulted in relief being granted in the Plata case. While the state's attempt to somehow place a timeline on a *Brady* claim is intriguing, it is logically circular and thus fails.

A better analogy would be if an undercover narcotics officer gave testimony against an individual, then in a later case was found to have fabricated remarkably similar testimony against a second individual. While certainly different in time, the fact of the undercover officer's lies in a similar situation was clearly not available until it was discovered. Such is the nature of indeed almost all *Brady* claims; one only discovers later that the state sponsored false testimony or withheld crucial evidence. If it was discovered at the time, it would have been revealed and thus could have been used by the defense.

Therefore, while the state cites to *United States v. Sanchez*, 340 U.S. 42 (1950) and *Brogdon v. Blackburn*, U.S.____107 S. Ct. 28, 92 (1986) those cases are simply not on point. The testing methods and scientific procedures that the state's "expert" relied upon have been shown by two other experts and an entire other set in the Plata case to have been wrong. If a further analogy is needed, this is a kin to the Houston Police Department's now infamous series of lab mistakes, mishandlings, and outright fabrication of forensic reports. The discovery of

4

incompetence and malfeasance is normally always after the damage has been done, as in this case. *Brady v. Maryland*, 373 U.S. 83(1963) applies here and Mr. Hunter is entitled to a new punishment trial or at the very least a hearing before this Honorable Court in which the truth of his retardation can finally be determined.

ON CLAIM TWO AND THREE

Mr. Hunter's pre age eighteen IQ was clearly quite low, in the 60's. Doctor Denkowski, in a bit of circular reasoning that was as illogical as much of his other testimony, indicated that the earlier report could not be right because the current report was too high. This is despite the fact that the current report also indicated a range that could have been as low as 69 but was administered in a way that made a more accurate reading difficult.

The state, while complaining of the sarcasm in Dr. Hayes' review of Dr. Denkowski's method, does not dispute the truth of them. (See page 64 of the state's response.) The petitioner concedes that the tone of Dr. Hayes' letter attacking Dr. Denkowski's method was perhaps sarcastic; however, with due respect to the State, if sarcasm were a bar to review then many of our finest jurist's opinions would never have been published.

Dr. Averill's letter, which also criticized Dr. Denkowski, pointed out that the IQ test that Mr. Hunter took while handcuffed would not normally be a correct test and that his verbal IQ would be a more reliable indicator. (See R.R. Vol. 26, pg. 162-164) As this court is likely aware from the literature available from the American Association for the Mentally Retarded, most IQ tests have a plus or minus range of five points. In the end the defense clearly established that Mr. Hunter was retarded and thus protected from execution because of his reduced moral culpable under *Atkins v. Virginia*. If this Honorable Court is uncertain as to the final facts of this

matter then it is respectfully asked to present a hearing since Mr. Denkowski's' measurements are unreliable.

ON CLAIM FOUR

While the state is correct in that the Supreme Court has not held that *Atkins v. Virginia*, 536 U.S. 304 (2002) requires the proceeding that Hunter advocates, ie, a pretrial determination, likewise, the case it points to- *Briseno v. State,* 135 S.W. at 8 (2009) has not been adopted by the Supreme Court either. In fact the "Briseno factors" are actually quite at odds with the determination to mental retardation, at least according to the guidelines issued by the American Association for the Mentally Retarded.

If one is logically to give meaning to *Atkins v. Virginia*, which relied considerably upon those same guidelines from the AAMR, it makes little sense legally or practically to advance a test such as under Briseno that actually undercuts the rationale for that decision. The factors in Briseno include the nature of the crime itself- this simply invites sensationalist speculation on the part of the jury as to the amount of "planning" required to commit a crime or the "consciousness of guilt" or wrongdoing evidence by an accused under a Briseno analysis. Retardation is not insanity or incompetency, yet the Briseno tests continually try to introduce factors that are more a kin to those tests than those for retardation under the AAMR guidelines. Thus the logic of the state's argument is somewhat lost since Briseno is clearly an attempt to undermine the usefulness of *Atkins* by introducing tests that frankly have no place in the determination of retardation. The Petitioners' claim is thus meritorious, and should be granted.

ON CLAIMS FIVE AND SIX

The Petitioner disagrees respectfully with the state that a factual sufficiency review is not cognizable on a habeas.  This Court has powers of fact finding under the special habeas rules and equity and equitable powers even with the deference shown to state decision under the principles of comity.  Logically implied within those fact findings powers is the ability to determine a factual sufficiency review.

However, taken under a legal sufficiency review *Jackson v. Virginia*, 443 U.S. 307 (1979) if one is viewing the evidence (facts) in the light most favorable to the prosecution, one should look here that the facts and the standard of review work against a rationale fact finder determining that Mr. Hunter was a future danger to society.  The state correctly cites the *Keeton v. State* factors at page 68 of its response.  See *Keeton v. State*, 724 SW 2d 58, 61 (Tex. Crim. App. 1987).  These factors include the circumstances of the offense including one, the defendant's state of  mind, two, whether he was working alone or with other parties to the calculated nature of the acts, three, the forethought and deliberateness of the execution, four, the existence of a prior criminal record and the severity of the prior crimes, five the defendant's age and personal circumstances at the time of the offense, six, whether the defendant was acting under duress or the domination of another at the time of the offense, seven, psychiatric evidence and eight, character evidence.

Taking the state's argument logically in sequence, society ie, the society to which Mr. Hunter is supposed to be a danger to in the future, largely means prison.  *Boyd v. State* 811, 2d, 95 (1991).  Mr. Hunter is serving a life sentence in which he must serve a flat calendar time of over four decades before he is even eligible for parole.  This means Mr. Hunter would be a man in his 70's <u>if</u> he could actually make parole.  Once again logically it is prison society to which we

must look to see if a determination of future dangerousness was rationale.  Looking at the circumstances of the crime itself, we see that Mr. Hunter expressed remorse even at the time of the crime, that although it was a shooting death. Mr. Hunter was clearly not even clever enough to dispose of the video that was made of the entire incident.  Second, if one looks at if the act was calculated, certainly this appeared to be a crime of opportunity as Mr. Hunter has not even thought far enough ahead to plan to have a getaway vehicle there but instead took one from one of the complaining witnesses.  Third, if we look at the "forethought" exhibited here it was certainly not that of a criminal mastermind.  Mr. Hunter never disposed of any evidence and in fact the video tape which was the most condemning piece, was in the car when it was found. On the fourth factor there was a long criminal record dating back a number of years.  However, in several of the more serious ones leading up to this incident, Mr. Hunter appeared to be acting with others and at their direction.  There was also considerable dispute about what role, if any, he had on a stop and shop on November 12, 2003.  Although the state's forensic evidence had him in the store, there is no indication from any reliable source as to who committed the robbery or pulled the trigger in that instance.  In the fifth criteria, it is important to determine not only the defendant's age, but his mental age and personal circumstances as well.  The defendant is now 39 and was in his early 30's at the time of trial.

      He will "age out" while in prison and become markedly less prone to any acts of violence as testified to by Dr. Conroy at this trial.  (See. R.R. Vol. 25, pg. 59)  This court should also be mindful of Hunter's mental age which, considering his retardation level IQ  should be place at a much, much younger age. This factor thus has two arguments weighing against a finding of future dangerousness, Mr. Hunter's body will age out and he will become less dangerous, both physically and in his behavior, while his mind has always been weaker and less capable to

people his own age.  In the sixth factor, it is difficult to determine at the time of this crime whether or not Mr. Hunter was acting under duress or the domination of another.  Although no one appeared in the video, it is clear from his past experience s leading up to this he worked with a partner. If this was an action of his own, it is unclear from the record whether he was acting under some form of duress or incapacitation. Seven, the psychiatric evidence offered by experts on mental retardation, showed that Mr. Hunter was in fact so far below normal in his capacity that he likely would have qualified for a guardianship in a civil court proceeding.  Last, the character evidence introduced did seem to indicate that Mr. Hunter had the capacity for kindness although it appeared he had also grown up in a difficult environment in which he picked up some habits of aggression.  The defense evidence regarding Mr. Hunter's ability to be controlled and his essence capacity and desire for violence, when weighed against these factors, mitigates strongly against the CCA's affirmance of the jury's finding of future danger.  Relief should be granted on this claim.

ON CLAIM SEVEN

In this the State appears to be attempting to circumvent the simple logic of Mr. Hunter's argument by subsuming it within the overall burden of proof for the state.  This should fail for the reasons shown below.

It is a fundamental tenant of due process in a criminal proceeding that a person must be found guilty beyond any reasonable doubt. In *Re Winship*, 397 U. S. 358 (1970), the state attempts to have the tail wag the dog by arguing that unadjudicated extraneous offenses upon which  the jury will base a decision for death should not meet that same standard. Due process refers, in the Fourteenth Amendment, to deprivation of life and liberty.  The Texas instruction for introduction of unadjudicated offense in <u>noncapital</u> cases requires proof beyond a reasonable

doubt for them to be admissible at punishment. See *Mitchell v. State*, 931 SW 2d 950 (Tex. Crim. Ap. 1996)  It defies due process for there to be a lesser burden on the admissibility of unadjudicated of offenses in a capital cases where the jury decides the life or death of a defendant.  This is the fundamental due process argument that the Petitioner raises.  It is straight forward enough that it is difficult to see how the failure to provide such an instruction to the jury when requested is not a fundamental deprivation of liberty and due process.  This seems so simple and straight forward yet the state would have this court stand due process on its head by citing *McFarland v. State*, 928 Sw 2d at 512.  This is exactly the tail wagging the dog type of argument that the CCA has long used to circumvent federal constitutional requirements, from *Penry I* and *II* down through *Smith v. Texas*.  It is a mistake to take the Court of Criminal Appeals' interpretation of a stature requirement and somehow twist that into a legitimate due process analysis.  The fact that the statute is different is the fundamental root of the due process violation, and attempting to place it in the context of a larger future danger question does not save it.  Finally, in regards to the *Kottekes* test for harm, this error certainly had substantial influence in determining the jury's verdict.  See *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The jury heard numerous example of unadjudicated violent offense which undoubtedly had a prejudicial effect on their answers to both future dangerousness questions and the question on mitigation. This claim is meritorious and relief should be granted.

ON CLAIM EIGHT AND NINE

In claim eight the knowledge of eligibility for parole is a key factor in jury deliberations. While the Texas capital punishment scheme enforces the time, it did not provide for life without parole, the knowledge, when coupled with the jury's requirement to answer the special issues results in an extraordinary dilemma for a jury very similarly to the one experienced by jurors

10

who grappled with the nullification instructions present in *Penry v. Johnson*, 532 U.S. 782 (2001). In that case, jurors were placed in the dilemma to be told to answer the questions on the special issue truthfully, but then, upon the nullification instruction receipt, being ordered to lie on their issues if they found mitigation factors. The Supreme Court could not rely on those determinations so neither should federal courts rely on determinations made here where the jury factors in the possibility of parole into its decision on future danger regardless of what evidence is offered. (The court can take judicial notice of the fact that since the imposition of life without parole in Texas, death filings in Harris County have dropped from an average of 15-20 per year to four, and Texas sentences across the state has plummeted.)

As to claim nine, the long trend in Supreme Court jurisprudence has been to reduce criminal responsibility for those who have lessened capabilities, such as the mentally infirm and insane. This trend has even extended to juveniles to be less morally culpable then their adult counterparts because they are simply less capable of making rational decisions.

In *Atkins v. Virginia* the Supreme Court of the United States held that those who suffer from mental retardation should not be executed. Reasoning that individuals who were fundamentally different in capability should also be held to a different standard of moral culpability, the court noted in both their independent judgment and in the judgment of many states that the retarded were held to be less responsible for their actions and hence **did not** come under the category of "worst of the worst" for which we reserved the penalty of death. *Atkins v. Virginia* at 536 U.S. 304 (2002). Later in *Roper v. Simmons* 543 U.S. 551 (2005) the Court held under similar reasoning that because juveniles as a group were less capable of restraining their actions and understanding the consequences of those same actions that it would serve neither the purposes of retaliation nor that of deterrence to impose the ultimate penalty on those whose youth prevented

11

them from behaving with the moral consciousness and foresight of adults. *Roper v. Simmons,* id. In both of these cases the Court exercised both its own judgments as independent arbiter of the constitution and the growing consensus both nationally and internationally against holding the less capable as culpable as the rest of us. See *Roper v. Simmons* and *Atkins v. Virginia*. While severe mental illness also renders any individuals less capable even when it falls short of outright insanity, it is now time for Texas to recognize that in <u>this case</u>, under these facts, that imposing a death sentence would be unconstitutional under the reasoning of *Atkins* and *Roper*.

The Applicant does not seek a blanket prohibition of the execution of those suffering from mental illness or disability. However, in severe cases, such as those who suffer from schizophrenia or traumatic brain injury or other crippling diseases such that they could not maintain a normal life without extensive psychiatric assistance and medication, then in those particular cases execution serves neither the purposes of retaliation nor deterrence. See *Ford v. Wainwright* 477 U.S. 399 (1986); see also *Panetti v. Quarterman* 551 U.S. 930 (2007).

The information provided at trial clearly indicated, even if one could argue that Mr. Hunter was not retarded, that he was deeply damaged. It is a logical extension of the line of cases cited above that as an individual, Mr. Hunter is so far removed from the normal competency of the population that in this limited instance, the Eighth Amendment made viable in Texas through the Fourteenth Amendment, prohibits his execution as he is one of those individuals who have proven to be among the least capable of our population and thus undeserving of the ultimate penalty. This claim is meritorious and should merit relief.

ON CLAIMS TEN, ELEVEN, TWELVE, AND THIRTEEN

Mr. Hunter brings claims ten and eleven under the International Covenant of Civil and Political Rights. Hereafter it shall be referred to as the ICCPR.  Under the Supremacy Clause of the constitution, the ICCPR is a treaty obligation of the United States and thus enforceable against the states.  Under Article Fourteen and Article Six of the ICCPR, Mr. Hunter should be able to invoke the shield of the United States' obligations under treaty as a federally enforceable constitutional provision a kin to the statute that makes the failures in Texas' criminal review glaringly obvious.  The State cites the Senate Executive Report for the proposition that the covenant will not create a private cause of action in U.S. courts.  (See page 96 of the state's response).  Here Mr. Hunter does not seek a cause of action; rather he seeks shield against an unjust execution based upon violations of clearly established international laws as made enforceable against Texas under the Supremacy Clause.

In claims twelve and thirteen under the Convention Against Torture, or CAT, Mr. Hunter seeks to apply the implementing legislation and regulations already in effect in Unites State courts across the land for the protection of those individuals facing deportation.  The State's argument against Mr. Hunter that the treaty is not self executing fails at the Convention Against Torture is hardly the subject if implementation legislation that has a long and honored history of case law.  Though this case law has normally been applied as a shield by foreign nationals seeking to avoid death or torture at the hand of a foreign government, the protections of CAT are no less valid as shield against an imposition of needless pain by a lethal cocktail of drugs nor against the prohibition of executing the disabled, which Mr. Hunter clearly is.  The CCA's determination about the imposition of capital punishment <u>may be</u> true in a broad sense but the specific issues raise by Mr. Hunter here, to Mr. Hunter's knowledge, are those of first

13

impression. They regard the application of a treaty's provisions to a specific manner of execution and to a specific targeted group, ie, the disabled. The findings of the CCA on this matter are thus not due federal deference as they are not reasonable nor applied to clearly established federal law.

**CONCLUSION**

Based on the foregoing, the Petitioner urges this Court to conduct additional fact finding, permit discovery, hold an evidentiary hearing, and issue an order denying the motion for summary judgment and granting relief for Mr. Hunter.

Respectfully submitted,

s/_____
PATRICK F. MCCANN
909 Texas Ave #205
Houston, Texas 77002
TBA 00792680
713-223-3805
713-226-8097 FAX
ATTORNEY FOR APPLICANT
Calvin Hunter

## **CERTIFICATE OF SERVICE**

This is to certify that on February 22, 2011, a true and correct copy of the above and foregoing document was served to the Assistant Attorney General, Laura Turbin at their mailing address in Capitol Station.

/s_____
Patrick F. McCann